**PILGRIM DISTRIBUTING CORP.,**
**Plaintiff,**

v.

**TERMINAL TRANSPORT CO., INC.,**
**Defendant.**

**Civ. A. No. 7592.**

United States District Court,
S. D. Ohio, W. D.

Oct. 15, 1974.

Theodore K. High, Cincinnati, Ohio, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID S. PORTER, District Judge.

The instant action was brought pursuant to Title 28 U.S.C. § 1332 (diversity jurisdiction) and Title 49 U.S.C. §§ 319 and 20 (11) ("Carmack Amendment" to the Interstate Commerce Act) and tried by the court without a jury.

Plaintiff, Pilgrim Distributing Corporation ("Pilgrim") is a corporation incorporated under the laws of the State of Kentucky, with its principal place of business in the State of Kentucky. Plaintiff is engaged in the business of wholesaling wine and liquors.

Defendant, Terminal Transport Company, Inc. ("Terminal Transport") is an interstate common carrier incorporated in a state other than the State of Kentucky and has a terminal located in Cincinnati, Ohio.

This action was brought against the defendant as delivering carrier for damages to a shipment of imported German wine ordered by the plaintiff. The defendant counterclaimed for storage charges for the wine.

## FINDINGS OF FACT

In 1969, the plaintiff ordered four hundred (400) cases of wine from West Germany. The wine was imported from Germany through the port of Mobile, Alabama, consigned to "Collector of Customs, care of Pilgrim Distributing Company, Newport, Kentucky."

Upon arrival at Mobile, the plaintiff's agent paid a sight draft for $2,383.00 and received an original bill of lading, which it endorsed and delivered to Southern Traffic Association, a division of W. A. Zanes and Company of Louisiana, Inc. As agent for the plaintiff, Southern Traffic then arranged for the inland freight carriage of the wine to Pilgrim in the Cincinnati, Ohio freight district. The inland carriage was interlined with the Central Motor Ex-

Harold G. Korbee, Cincinnati, Ohio, for plaintiff.

press, the initial carrier, transporting the wine from Mobile, Alabama to Chattanooga, Tennessee, where the trailer was transferred to the defendant, who delivered it to its destination. Pursuant to these arrangements, Southern Traffic prepared a uniform straight bill of lading consigning the shipment to "Collector of Customs, care of Pilgrim Distributing Company" and transmitted a copy of the bill of lading it had prepared to Central Motor Express, the initial carrier. The wine was placed in a trailer, which was sealed by the customs official in Mobile.

At the trial on the merits, the plaintiff introduced its copies of the bill of lading prepared by Southern Traffic Association which copies contained the notation, "Protect Wines From Freezing." However, the Copy No. 2 given to Central Motor Express, and subsequently transferred to the defendant, was also introduced at the trial and this copy contained no such notation. From other evidence adduced at trial, it seems likely, and this court so finds, that the notation, "Protect Wines From Freezing," was typed on the copies of the bill of lading introduced by the plaintiff at some point in time subsequent to the shipment in question, and that defendant did not receive notice of any "Protect Wines From Freezing" request by plaintiff or plaintiff's agents on defendant's copy of the bill of lading.

The tariff on file with the Interstate Commerce Commission provided that the carriers would provide protective heating on request.

The trailer used to transport the wine was equipped with heaters which could have been used to provide protective heating.

As previously arranged by Southern Traffic, the shipment of wine was picked up by Central Motor Express and transported to Chattanooga, Tennessee, where on December 9, 1969, it transferred the entire sealed trailer containing the wine to Terminal Transport. Terminal Transport in turn carried the wine to its terminal in Cincinnati, Ohio, where it arrived on December 12, 1969.

While there is dispute between the parties on the point, the testimony and evidence adduced at the trial indicates, and this court finds as a fact, that on the very day that the wine arrived in Cincinnati, the defendant notified the United States Custom Service of the arrival of the wine. Further, the Court finds that through an established procedure whereby the plaintiff's agent in Cincinnati, Henry Wess and Company, regularly visited the customs office in Cincinnati several times a day to pick up copies of transportation entries relating to the arrival of shipments to its principals, the plaintiff's agent, Henry Wess and Company, received notice of the arrival of the shipment at about the same time. Plaintiff's agent, Henry Wess and Company, did not testify at the trial, but plaintiff's president testified that plaintiff first received actual notice of delivery on January 8, 1970.

After arrival of the shipment of wine in Cincinnati, the wine remained in the trailer at the defendant's terminal while it awaited the plaintiff's instructions for delivery. The evidence produced at trial indicates that it was the responsibility of Pilgrim to furnish the customs officials with whatever they needed to prepare their warehouse entry and to set up the delivery date. The plaintiff did not furnish the customs officials with the pertinent documents until January 8, 1970, on which date the delivery of the wine and the customs inspection finally occurred.

Upon inspection of the wine shipment at plaintiff's docks in Newport, Kentucky, a city immediately across the Ohio River from Cincinnati, it was discovered that the bottles were frozen. The Pilgrim officials quickly conferred with their experts and determined that wine which has been frozen is not marketable, since freezing causes wine to lose its bouquet and become musty. The plaintiff, therefore, refused the shipment and the driver was instructed by the defendant to return the wine to the defendant's

terminal, where it was stored and thawed.

Sometime after the rejection of the first delivery of the wine, the plaintiff decided, and apparently communicated its decision to the defendant, that if the defendant would redeliver the wine to the plaintiff, the latter would accept delivery. However, when the defendant did in fact, redeliver the wine on January 21, 1970, the shipment was again refused. This second rejection by Pilgrim was motivated by its refusal to pay the redelivery costs and storage costs demanded by the defendant. After this second rejection, the driver again returned the wine to the defendant's facilities for storage.

At the trial, evidence was introduced by the defendant in the form of climatological data compiled from records of the National Weather Records Center and published by the U. S. Department of Commerce, which showed the high, low and average temperatures prevailing at major cities along the route taken by the carriers in delivering the wine during the month of December 1969. The same data concerning temperatures prevailing the Cincinnati area during the months of December 1969 and January 1970, was also introduced into evidence. This data indicates that the temperatures along the route of the shipment at the approximate time of shipment, were not such as would likely have caused the wine to freeze. Thus, the high and low temperatures in Chattanooga on December 9, 1969, the day that the trailer was transferred to Terminal Transport from Central Motor Express, were 48° and 25°, respectively, with an average of 37°. In Louisville, Kentucky, on the 10th and 11th of December, 1969, the approximate days on which the wine shipment passed through that area, the average temperatures on both dates were 37° and the low was 33°. Keeping in mind the alcoholic content of the goods in question, it seems clear that these temperatures were not so severe as to cause the wine to freeze.

In contrast, the data introduced showed that the temperatures in Cincinnati during the twenty-seven day interim between the arrival and delivery of the wine, when it was, through the delay of plaintiff's agent in making the necessary arrangements for inspection and delivery, kept in an unheated trailer, were generally sub-freezing and were particularly severe during the latter part of the twenty-seven day period. Thus, on January 7th and 8th, the day before and the day of delivery, the temperatures were sub-zero.

From this evidence the court finds that the wine became frozen sometime after its arrival in Cincinnati, and sometime before the first rejection by the plaintiff. Further, we find that the freezing occurred toward the latter part of this 27 day period.

## CONCLUSIONS OF LAW

### A. *Plaintiff's Claim*

Plaintiff's cause of action in this case is founded upon the Carmack Amendment to the Interstate Commerce Act (Title 49 U.S.C. § 20(11)) which provides in part as follows:

§ 20 par. (11) *"Liability of initial and delivering carrier for loss; limitation of liability; notice and filing of claim.* Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or with-

in an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability imposed; . . . ."

It is apparent then from § 20(11), as well as from § 319 of the same title, that the liability of the defendant under the Carmack Amendment is at the outset premised on the defendant's being a common carrier by motor vehicle. While the defendant might readily admit, indeed insist, that it is a common carrier under other circumstances, it here maintains that *it was not a common carrier vis a vis the shipper at the time the goods in question were damaged*, and that, therefore, its liability, if any, is not governed by the Carmack Amendment. For the reasons set forth below we agree with the defendant's position.

Section 16 of the "Contract Terms and Conditions" portion of the bill of lading under which the wine in question moved, provides that, except for negligence, a carrier shall not be liable for loss or damage occurring while stopped in transit at the shipper's request.

Section 4 of the "Contract Terms and Conditions" portion of the bill of lading provides that where property is not received by the party entitled to receive it within the free time allowed (as set forth in the applicable tariff) after notice of arrival is sent, or the property is refused by the party who is entitled to receive it, the liability of the carrier is that of a warehouseman only.

■ It has long been held that the bill of lading is a contract between the shipper and the carrier. See e. g. Southern Ry. v. Prescott, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836 (1916). An agreement between a carrier and a shipper in a bill of lading to limit the responsibility of the carrier to that of a warehouseman after goods reach their destination and notice thereof is given to the consignee is reasonable and is nei-

ther against public policy, or the provisions of the Carmack Amendment; General American Transportation Corp. v. Indiana Harbor Belt R. Co., 191 F.2d 865 (7th Cir. 1951), cert. den. 343 U.S. 905, 72 S.Ct. 636, 96 L.Ed. 1324.

■■ A warehouseman is liable only for negligence, and the burden of proving such negligence rests on the party asserting it. United Metals Selling Co. v. Pryor, 243 F. 91 (8th Cir. 1917), cert. den. 245 U.S. 662, 38 S.Ct. 61, 62 L.Ed. 536.

The free time referred to in paragraph 4 of the bill of lading as set forth the in the tariff, began at 7:00 a. m. of the first business day after notice of arrival. In this case, since December 12, 1969, was a Friday, the free time expired on Monday, December 15, 1969. After the expiration of the free time on December 15, 1969, the defendant's liability was no longer governed by the Carmack Amendment as it then became merely a warehouseman in its relationship to the plaintiff. As noted above, the climatological data introduced by the defendant showed that the damage to the wine, caused by freezing, occurred sometime in the latter part of the 27 day period after the arrival of the wine in Cincinnati on December 12, 1969, and the first attempted delivery on January 8, 1970. Thus at the time of the occurrence of those acts or commissions which caused the wine to freeze, i. e., leaving the wine in an unheated trailer while awaiting its delivery, the defendant was not acting as a carrier in its relationship with the plaintiff. We, therefore, find that the standard of liability imposed under the Carmack Amendment has no application here.

Having found that the defendant was acting as a warehouseman rather than a carrier at the time the damage to the wine occurred, and that as warehouseman the defendant was liable only for negligence, the question arises as to whether the plaintiff has sustained its burden of proving negligence on the part of the defendant.

The tariff provision under which the goods in question were transported, provided that the defendant would provide heater service if such were specifically requested by the shipper on the bill of lading, and when it is not requested on the bill of lading, the carrier would not be liable for loss or damage resulting from failure to provide heater service.

■ Tariffs bind both carriers and shippers with the force of law. Lowden v. Simonds-Schields-Lonsdale Grain Co. 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939). See also Crancer v. Lowden, 315 U.S. 631, 635, 62 S.Ct. 763, 86 L.Ed. 1077 (1942); Robinson v. Baltimore & Ohio R. R., 222 U.S. 506, 509, 32 S.Ct. 114, 56 L.Ed. 288 (1912). Indeed, it has been said that a tariff has the force and effect of a federal statute. See dissent of Mr. Justice Douglas in Missouri Pacific R. R. Co. v. Elmore and Stahl, 377 U.S. 134, 146, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964).

■ ■ As noted in our Findings of Fact, there was no notation to protect the wine from freezing on the copy of the bill of lading given to the carriers in this case, the notation having been added some time after the carriers took possession of the goods for transport. Further, since the trailer had been sealed and was to be opened only by the consignee, there seems to have been no way for the defendant to have lighted the protective heaters, either during the course of shipment or after the goods had arrived and were awaiting the plaintiff's preparations for delivery. The defendant was not authorized to break the customs seal to store the goods in a heated place even were it on notice that such was necessary.

In light of the above facts and the tariff provision, we can find no duty owing to the plaintiff to provide protective heating during the period when the damage from freezing occurred, i. e., during that period of time following the expiration of free time and the plaintiff's first rejection of the shipment.

■ Nor can a duty to protect the wine from freezing be implied from the nature of the goods. The defendant, lacking knowledge of the freezing properties of wine, might assume, with some justification, that the alcoholic content of the wine was an inherent protection against freezing—an assumption no doubt reinforced by the failure of the shipper or its agents to request protective service as provided in the tariff.

In summary then, we find that after the expiration of the free time provided for in the tariff the liability of the defendant was that of a warehouseman only and not as provided in the Carmack Amendment. We find further that it was during this period of time that the damage to the wine from freezing occurred, that such damage was not proximately caused by any negligence on the part of the defendant, and that the defendant was free from negligence as a warehouseman.

Even were we to find that the defendant was a carrier at the time the damage to the wine occurred, or more correctly that the damage occurred while the defendant was acting as a carrier, and that the Carmack Amendment governed, we do not think the defendant is liable. The Carmack Amendment (49 U.S.C. § 20(11)) as set forth above, makes carriers liable "for the full actual loss, damage, or injury . . . caused by" them to goods they transport and declares unlawful and void any attempted means of limiting this liability. Missouri Pacific R. Co. v. Elmore & Stahl, supra. The statute codifies the common law rule that a "carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by: '(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) the public authority; (e) or the inherent vice or nature of the goods.'" Missouri Pacific R. Co. v. Elmore & Stahl, supra, at 144, 84 S.Ct. at 1144.

The *Elmore & Stahl* decision, supra, has been cited by the plaintiff herein as

a key decision on the issue of the defendant's liability under the Carmack Amendment. While we do not believe that the decision is applicable here, we think that as the most recent significant Supreme Court ruling on the Carmack Amendment, its importance requires that we state our reasons in more than summary fashion.

In *Elmore & Stahl* a motor carrier who had complied with all of the shipper's instructions was held liable under the Carmack Amendment for damages to melons which arrived at their destination in a decayed condition. On appeal from a decision of the Supreme Court of Texas, the United States Supreme Court stated the issue on appeal thusly:

> The question presented in this case is whether a common carrier which has exercised reasonable care and has complied with the instructions of the shipper is nonetheless liable to the shipper for spoilage in transit of an interstate shipment of perishable commodities, when the carrier fails to prove that the cause of the spoilage was the natural tendency of the commodities to deteriorate.
>
> 377 U.S. 134 at 135, 84 S.Ct. 1142 at 1143.

In accordance with Texas practice, the case had been submitted to the jury on special issues. The jury had found that the carriers had performed all transportation services without negligence and that the decay was not due to an act or omission of the shipper in giving instructions to the carrier but had also found that the cause of the decay was not due to an "inherent vice" of the melons. In essence then, the jury found that the cause of the decay was not proved.

The Supreme Court rejected the argument of the defendant that where goods are perishable and the nature of the damage to the goods is spoilage and the jury finds that the carrier performed the services requested without negligence, the law presumes that the spoilage was due to the natural tendency of

perishables to spoil. Rather, the court held that the causes which except a carrier from the liability imposed by the Carmack Amendment must be proved by the carrier and will never be presumed.

The broad significance of *Elmore & Stahl* then, is that it rejects an interpretation of the Carmack Amendment which would allow the carrier to avoid its burden of proving that the cause of damage was one of those excepted from the Amendment by presumptions and reaffirms the traditional view that in the absence of an affirmative showing of the cause of the damage, and despite a finding of no negligence on the part of the carrier, the carrier is liable.

So stated the *Elmore & Stahl* decision is easily distinguishable from the instant case. Unlike *Elmore & Stahl*, we are not asked to *presume* the cause of the damage to the goods. The cause of the damage was freezing and the proximate cause was the failure of the plaintiff's agents to request protective service and the delay of the plaintiff's agents in arranging inspection and delivery. Unlike the Texas jury, we find that the cause was the fault of the shipper, which is a recognized exception to the liability imposed by the Carmack Amendment, *Elmore & Stahl*, supra, at 136, 84 S.Ct. 1142. "Where damage arises from the fault of the shipper or consignee the carrier has no liability under the express language of the [Carmack Amendment]. F. J. McCarty Co. v. Southern Pac. Co., 289 F.Supp. 875, 881 n. 32 (N.D.Cal.1968)," Fraser-Smith Co. v. Chicago, Rock Island & Pacific R. Co., 435 F.2d 1396 at 1399 (8th Cir. 1971).

In summary, we find that even were the defendant a carrier within the meaning of the Carmack Amendment at the time of the damage to the wine, the defendant has affirmatively shown that it was free from negligence and that the damage was caused by the fault of the shipper's agents and that such fault is imputed to the plaintiff as principal as a matter of law. The defendant is, therefore, not liable to the plaintiff on plaintiff's claim.

## B. Defendant's Counterclaim ·

Also in issue in this case is the liability of the plaintiff for storage charges for wine incurred as a result of the plaintiff's refusal on two occasions to accept delivery of the wine.[1]

The law on the duty of a consignee to accept goods, even where damaged, is summarized in Fraser-Smith Co. v. Chicago, Rock Island & Pacific R. Co., 435 F.2d 1396 (8th Cir. 1971) as follows:

"The law is well settled that where goods are shipped by common carrier and become damaged in transit, the consignee nevertheless has the duty to accept the shipment. Under such circumstances the consignee's obligation is not affected by the fact that the goods have been injured or damaged during transit, unless they are considered to be 'totally worthless.' Sunset Motor Lines, Inc. v. Lu-Tex Packing Co., 256 F.2d 495 (5 Cir. 1958); Strickland Transp. Co. v. American Distrib. Co., 198 F.2d 546 (5 Cir. 1952); Robinson v. Georgia Sav. Bank & Trust Co., 106 F.2d 944 (5 Cir. 1939); Clifford v. Merritt-Chapman & Scott Corp., 57 F.2d 1021 (5 Cir. 1932). See also Biltmore Mfg. Co. v. Overnite Trans. Co., 157 F. Supp. 891 (W.D.N.C.1958); Miller's Law of Freight Loss and Damage Claims, ch. 5 § E (3rd ed. 1967) (hereinafter cited as Miller's). There are many practical and sound reasons which buttress this rule. For one, it has long been recognized that a common carrier's liability as such ceases upon delivery of a shipment to the consignee. See Secretary of Agriculture v. United States, 347 U.S. 645, 647, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); Republic Carloading and Distrib. Co. v. Missouri Pac. R. R., 302 F.2d 381 (8 Cir. 1962); 13 C.J.S. Carriers § 185 (1939). Additionally, it is generally considered that a consignee (in this instance the consignee and shipper are the same entity) is in a much better position to dispose of the damaged merchandise than the carrier who is not in the business of buying and selling the product involved. See Kennedy & Kratzer, Inc. v. Chicago, B & Q R. R., 106 Ill.App. 2d 278, 245 N.E.2d 910 (Ill.App.1969). This is consonant with the fact that unless the goods are worth only 'salvage value' at their point of delivery (cf. Atlantic Coast Line R. R. v. Tifton Produce Co., 179 Ga. 624, 176 S.E. 624, 96 A.L.R. 772 (1934), the carrier could be at the mercy of low bidding on the product by a consignee or third parties. Under such circumstances, there exists no justification to make a carrier a forced buyer by a forced contract. All of these principles stem from the common law recognition that every party must use every reasonable means to lessen the damage caused by another. Restatement of Contracts § 336(1); 11 Williston, Contracts § 1353 (3d ed. 1968); and 5 Corbin, Contracts § 1039 (1964).

435 F.2d 1396 (8th Cir. 1971).

As noted in our Findings of Fact, the wine was totally worthless to the plaintiff in light of its loss of bouquet, or at least the plaintiff could not be sure it was not totally worthless without thereby rendering it so. However, on the facts of this case we do not think the plaintiff was free to reject the wine as it did.

Here the plaintiff as a dealer of wine was in a far better position first, to assess the value or lack of value of the wine and to appropriately dispose of it either by dumping it or selling it for salvage. Indeed, though it rejected the shipment of wine initially on the ground that it was damaged, it thereafter acted in such a manner as would lead the defendant to believe that it had some value. Thus, after the first rejection of the wine, it indicated to the defendant

---

1. By agreement of the parties the actual amount of charges due the defendant for storage, should the plaintiff be held liable therefor, is not in controversy.

that should delivery of the wine be attempted again it would accept. As we noted before, the second rejection was not based on the fact that the wine was valueless, but rather on the refusal of the plaintiff to pay storage charges and redelivery costs. Thereafter, the defendant continued to store the wine believing such to have value. The plaintiff did not instruct the defendant to destroy the wine, as it might have in order to mitigate the damages. Nor did it accept delivery and destroy the wine itself. Nor was the defendant able to sell the wine after rejection even though it believed the wine to have value. The defendant being only a carrier did not possess the appropriate liquor license required to legally sell wines in Ohio or any other state. Further, the defendant had no contractual control over the label entitling it to sell this particular brand of wine.

The tariff provision under which the wine was shipped provides that upon giving notice to one entitled to receive goods that the goods are available for delivery, and the expiration of free time storage charges *shall* be assessed against the party entitled to delivery. As demonstrated above, the tariff provisions on file with the Interstate Commerce Commission have the force of law and bind the shipper as well as the carrier. The carrier here then had the right to assess charges for storage for a reasonable period of time.

In light of the above, we feel that it was the duty of the plaintiff either to accept the wine, or, knowing it to be valueless, to inform the defendant of that fact and to instruct him to destroy it, thus terminating its duty under the appropriate tariff to pay charges for storage. Since the plaintiff failed to do this, and since the damage to the wine was in the first place caused by the failure of plaintiff's agents to request protective heating for the wine and in failing to notify plaintiff that the wine was on hand for delivery until January 8, 1970, rather than any fault of defendant, we find that the plaintiff is liable to the defendant for charges for the storage of the wine after the expiration of the free time provided for in the tariffs in the amount agreed upon by the parties herein.