PNH CORPORATION,
Plaintiff, Appellee,

v.

HULLQUIST CORPORATION,
Defendant, Appellant.

Garvey Transport, Inc., et al.,
Defendants, Appellees.

No. 87–1584.

United States Court of Appeals,
First Circuit.

Heard Dec. 9, 1987.

Decided March 30, 1988.

tion, I see no need to modify the injunction along those lines.

Robert J. Baum with whom Edward R. Wiest and Bradley, Barry & Tarlow, P.C., Boston, Mass., were on brief, for defendant, appellant.

Andrew F. Lane with whom William Hewig, III and Gaston Snow & Ely Bartlett, Boston, Mass., were on brief, for defendants, appellees Maersk Line Ltd., Maersk Container Service Co., Inc. and Moller S.S. Co., Inc.

William J. Doyle, Jr., with whom James D. Casey and Law Office of James D. Casey, Boston, Mass., were on brief, for defendant, appellee Garvey Transport, Inc.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

This is the Case of the Missing Freeze Dried Coffee. A shipper, P.N.H. Corp., purchased 2146 cases of Taster's Choice Freeze Dried Coffee from the Kendall Confectionery Co. in Cambridge, Massachusetts. The shipper contracted with Maersk Line to transport the coffee to Jeddah (Jidda), Saudi Arabia. The Maersk ship on which the coffee was to be transported was in Port Newark, New Jersey. The coffee therefore had to be transferred from Cambridge to Port Newark. En route, the container in which the coffee was stored was in the possession of three separate entities. When the container was finally opened in Port Newark, the coffee had disappeared. The mystery to be solved is where along the line of transport the coffee was pilfered. All of the evidence is circumstantial. The district court concluded that two of the three suspects had airtight alibis, and that therefore the mystery had only one possible solution. On that basis, the court granted summary judgment in favor of all other defendants against the middle, or second, carrier, Hullquist Corporation.

We now vacate and remand, because we find that the alibi of the final carrier, Maersk, cannot be evaluated definitively at the summary judgment stage. A jury will have to sift the clues to determine whodunit.

I.

The evidence, which is undisputed except as noted, is as follows. P.N.H. purchased the coffee from Kendall on April 8, 1985. Maersk[1] could not pick up the coffee in Cambridge, so it instructed P.N.H. to transfer the coffee to a container interchange facility in Everett, Massachusetts owned by defendant Hullquist. P.N.H. arranged for defendant Garvey Transport, Inc. to transfer the coffee from Cambridge to Hullquist. Maersk was to pick up the coffee at Hullquist and take it to Port Newark. The chain of custody was, therefore, Garvey to Hullquist to Maersk.

On April 9, 1985, a driver for Garvey picked up at Hullquist an empty container in which the coffee was to be stored. The Garvey driver arrived at the Kendall location in Cambridge at approximately 12:30 p.m. The 2146 cartons of coffee were hand-loaded into the container by the Garvey driver and two P.N.H. employees. Neither Garvey nor P.N.H. had remembered to provide a seal with which to secure the loaded container. Because it cannot be removed and restored without noticeable damage, a seal would normally provide some measure of protection against casual pilferage. The Garvey driver promised to seal the container once it arrived at Hullquist's facility in Everett, and to call P.N.H. with the identification number of the seal once it was applied.

The Garvey driver then drove the container to the Hullquist facility in Everett. The trip took approximately 40 minutes. There is no evidence that the contents of the container were checked upon arrival in Everett. The Garvey driver and a Hullquist employee applied Hullquist seal No. 15388, and prepared and signed a receipt to

---

1. There are three separate Maersk defendants in the case. For purposes of this appeal, they need not be distinguished here, and will be referred to collectively as "Maersk."

that effect. The Garvey driver phoned P.N.H. to notify them of the seal number.

Hullquist had been commissioned by Maersk to hold the container temporarily until a Maersk driver could pick it up to take it to New Jersey. The understanding was that the Maersk driver was to pick up the container that same afternoon. However, the driver called the Hullquist terminal late in the afternoon to inform Hullquist that he would not be able to pick up the container until the following day, due to mechanical difficulties. Normally, Hullquist did not store loaded containers overnight; its normal practice was to move such containers to more secure facilities in Malden, Massachusetts. On April 9th, however, Hullquist found out too late that such removal would be necessary, because the trucking company used by Hullquist to move containers ceased operations at 4:00 p.m. When informed of this state of affairs, a Maersk representative asked that Hullquist store the container overnight. Hullquist acceded to this request. The record is incomplete as to the nature of the agreement between Hullquist and Maersk as to overnight storage. To protect the container, Hullquist placed one end against a row of empty containers and moved another empty container against the other end. The coffee container could not be opened without moving one of the empty containers and breaking seal No. 15388. Because Hullquist was not in the business of overnight storage, it seemingly did not have any facilities available with which better to secure the container.

At 8:20 a.m. the next morning, the Maersk driver arrived at Hullquist to transport the container to Port Newark. Both the Maersk driver and a Hullquist employee testified in their affidavits that the Maersk driver placed an additional seal on the container, Brooks seal No. 1035050. The Maersk driver also signed a receipt, later submitted to the court, stating that Hullquist seal No. 15388 was still intact on the container. However, he later claimed in an affidavit and deposition that he had not in fact checked the seal to confirm the identification on the receipt.

The Maersk driver then drove to Port Newark. His trip took five hours, normal driving time for that distance. When he arrived in Port Newark, the driver placed another Maersk seal, No. 113406, on the container. At this time, apparently no one at Maersk checked the identification of the other seals. The truck and container were then weighed, and the container was disconnected from the truck and stored overnight at the Maersk yard. Maersk did not undertake to check the seals or open the container until the next morning. That morning a clerk, who had noticed a weight discrepancy the day before, reweighed the load and confirmed the unexplained weight shortage, which seemed to indicate that the container was empty. Maersk employees claim to have then broken the seals, opened the container, and discovered that the coffee was missing. The employees then checked the three seals they had removed from the container. In addition to the Brooks seal No. 1035050 and the Maersk seal No. 113406, the Maersk employees claim to have found Hullquist seal No. 18218. Hullquist seal No. 15388, that originally affixed in Everett, was not found, according to the Maersk employees. Despite knowing that the coffee had been heisted, and that the Hullquist seal was not that indicated on the receipt, Maersk apparently misplaced the seals. The Maersk defendants did submit a photograph of the broken, unattached seals, taken before they were lost.

P.N.H. filed an action against all of the carriers under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707. Subsection (a) of § 11707 provides that a shipper may recover the amount lost because of theft or damage of goods from either the initial carrier issuing the bill of lading or the carrier delivering the goods to their final destination, even if the goods were lost or damaged on those portions of the route handled by other carriers. The Carmack Amendment was enacted to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Reider v. Thompson,* 339 U.S.

113, 119, 70 S.Ct. 499, 502, 94 L.Ed. 698 (1950). P.N.H. established a prima facie case against the initial carrier, Garvey, by showing that the goods had properly been delivered to Garvey in Cambridge. The district court granted summary judgment against Garvey, and ordered payment to P.N.H. in the amount of its damages, $115,884. That judgment has not been appealed.

Subsection (b) of the Carmack Amendment allows the initial carrier found strictly liable under subsection (a) to be indemnified by the carrier "over whose line or route the loss or injury occurred...."[2] In response to the action by P.N.H., each of the defendants, Garvey, Hullquist, and Maersk, asserted cross-claims against each of the others. Garvey moved for summary judgment against Hullquist and Maersk, and Hullquist moved for summary judgment against Maersk and Garvey. No Maersk defendant has at any time filed a motion for summary judgment.

On May 20, 1987, the district court issued a memorandum and order granting Garvey's motion for summary judgment against Hullquist, and denying Hullquist's summary judgment motion against Garvey. The court found that "[t]he only plausible conclusion I can draw from the undisputed facts is that the loss of the coffee occurred while the cargo container was in Hullquist's care and custody." Because of this conclusion, the court denied Garvey's motion for summary judgment against Maersk. Finally, rather than ruling directly on Hullquist's motion for summary judgment against Maersk, the court *sua sponte* dismissed all cross-claims against the Maersk defendants. The court based these judgments on its conclusion that the coffee must have disappeared at the Hullquist facilities. It directed entry of judgment for Garvey against Hullquist for the entirety of the judgment entered in favor of P.N.H. against Garvey. In response to Hullquist's motion for reconsideration, the court reaffirmed its judgments in a memorandum and order dated July 28, 1987, except that it slightly decreased the total amount of damages in the judgment. Hullquist appealed.[3]

## II.

Hullquist initially contends that the district court made two errors of law with respect to the Carmack Amendment. First, it claims that it cannot be held liable under subsection (b) without proof of negligence. The district court based its judgment on a finding of strict liability, i.e., that Hullquist is liable because the coffee disappeared while in its custody. Hullquist argues that, although strict liability is the proper standard with respect to subsection (a) of the Carmack Amendment, subsection (b) implicitly incorporates a negligence standard.

This interpretation is contrary to the clear and unequivocal language of subsection (b): "The [initial] carrier ... is entitled to recover from the carrier *over whose line or route the loss or injury occurred....*" We think that the only fair reading of this wording is that it imposes strict liability. Nowhere is negligence or fault alluded to. We will not read an additional element of liability into the statute where the plain language leaves no room for it, and where there is no indication that Congress intended such an illogical construction.[4]

(Emphasis supplied.)

---

**2.** 49 U.S.C. § 11707(b) reads in full:

The carrier issuing the receipt or bill of lading under subsection (a) of this section or delivering the property for which the receipt or bill of lading was issued is entitled to recover *from the carrier over whose line or route the loss or injury occurred* the amount required to be paid to the owners of the property, as evidenced by a receipt, judgment, or transcript, and the amount of its expenses reasonably incurred in defending a civil action brought by that person.

**3.** Garvey declined to appeal the dismissal of its cross-claims against Maersk, undoubtedly because it thought that it was free from further liability.

**4.** This interpretation is not foreclosed by *American Foreign Ins. Ass'n v. Seatrain Lines of Puerto Rico, Inc.,* 689 F.2d 295 (1st Cir.1982). In that case, we applied the rules of Puerto Rico negligence law to resolve a dispute between two carriers as to liability for a shipper's losses.

■ Hullquist's second Carmack Amendment argument is that it is not a "carrier" for the purposes of section 11707(b), and is thus not liable under that section. The definition of a "carrier" in subsection 10102(2) of Title 49 includes both a "common carrier" and a "contract carrier." These two types of carriers are then further broken down into subcategories. 49 U.S.C. §§ 10102(4), 10102(6). The parties and the district court assumed that the only sort of "common carrier" at issue here is a "motor common carrier," and the only relevant type of "contract carrier" is a "motor contract carrier." Hullquist first contends that because it did not "hold[ ] itself out to the general public" to provide transportation, it was not a "motor common carrier" as that term is defined in 49 U.S.C. § 10102(14).[5] This may well be true. But a "motor *contract* carrier" need not hold itself out to the general public. It is alternatively defined as "a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons ... designed to meet the distinct needs of each such person." 49 U.S.C. § 10102(15)(B)(ii). The fact that Hullquist did not hold itself out to the general public thus would not preclude it from being defined as a carrier, as Hullquist arguably was a contract carrier in light of its continuing arrangement with Maersk to provide storage for containers.[6]

■ Hullquist nevertheless insists that such storage is not "transportation," as that term is used in subsection (15)(B). As the court below correctly noted, however, "transportation" is defined at 49 U.S.C. § 10102(26) to include:

(A) a locomotive, car, vehicle, vessel, *warehouse*, wharf, pier, dock, *yard*, *property*, *facility*, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, *storage, handling, and interchange* of passengers and property.

(Emphasis added.) This broad definition of transportation, which undoubtedly includes Hullquist's activities, includes all of a motor carrier's services incident to carriage and delivery. *See Southern Railway Co. v. Reid*, 222 U.S. 424, 440, 32 S.Ct. 140, 143, 56 L.Ed. 257 (1912); *Centraal Stikstof Verkoopkantoor, N.V. v. Alabama State Docks Dept.*, 415 F.2d 452, 456 (5th Cir. 1969) ("services rendered by a common carrier *in connection with* transportation of goods shall be covered by the Act") (emphasis supplied). A motor carrier cannot, under this definition, be absolved from liability merely because a loss occurred

---

The parties to that action conceded that the applicable law was that of Puerto Rico, and we did not even mention, let alone consider the applicable standards under, § 11707(b). In this case, by contrast, the parties and the district court have treated the case as arising under § 11707(b), and we therefore must determine liability under the Carmack Amendment.

Some courts have read a negligence standard into § 11707(b). *See Bonifield Bros. Truck Lines, Inc. v. Edwards*, 450 S.W.2d 240 (Ky. 1970); *Mid–Continent Int'l v. Evergreen Marine Corp.*, No. 87–C–2579, slip op. (N.D.Ill. Dec. 14, 1987) (following *Bonifield Bros.*) [available on WESTLAW, 1987 WL 28266]; *Bond Transfer, Inc. v. Consolidated Freightways*, 718 S.W.2d 34 (Tex.Ct.App.1986) (following *Bonifield Bros.*). The only reasoning given for such a construction is that at common law a negligence standard applied between carriers. This may be so, but the Carmack Amendment does not reflect this traditional understanding—its words are crystal clear. In rejecting the negligence stan-

dard, we do not mean to foreclose the possibility that negligence might provide a basis for indemnity or contribution when, for instance, the damage occuring over the line of the strictly liable carrier is caused by negligent acts on the part of a preceding carrier. This seems to have been the animating concern in *Bonifield Brothers*.

5. This argument refers only to the "common carrier" component of "motor common carrier." We discuss below the other component of that definition, *i.e.*, whether Hullquist was a *motor* carrier.

6. Although subsection (a) of the Carmack Amendment specifically refers only to "common carriers," subsection (b) is not so restrictive—it refers to "the carrier," without distinguishing between common and contract carriers. Hullquist implicitly concedes this point in its brief. Appellant's Brief at 21–22.

while the property was temporarily not in transit. Therefore, if Hullquist is otherwise a motor carrier, its storage facilities are "transportation" within the meaning of the Act.

On appeal, Hullquist suggests, albeit rather obliquely, yet another argument for its exclusion from the definition of "carrier" in the Carmack Amendment. Hullquist now argues, for the first time, that temporary storage services to a single entity "cannot be defined as *motor vehicle* transportation within the ambit of the Carmack Amendment." Appellant's brief at 22 (emphasis supplied). Hullquist's contention seems to be that, even if storage facilities would be considered "transportation" for a motor carrier, Hullquist is not such a carrier.

This argument seems persuasive, and possibly dispositive. The definitions of "motor common carrier" and "motor contract carrier" each specifically include a requirement of providing *"motor vehicle* transportation." 49 U.S.C. §§ 10102(14) & (15). While Hullquist's activities would constitute "transportation" under the Interstate Commerce Act for a person otherwise defined as a motor carrier, they do not themselves seem to constitute "motor vehicle transportation." "Motor vehicle" is defined in 49 U.S.C. § 10102(17) as "a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation...." Hullquist's operations apparently are not included in this definition. Thus, although Hullquist's activities would be subject to the Act were Hullquist a "motor carrier," Hullquist cannot be a "motor carrier" because it does not engage in "motor vehicle transportation."

Hullquist seems to have acted in the capacity of a warehouseman, rather than a carrier. As such, Hullquist would only be liable under common law negligence or some other statute. The Carmack Amendment, and the Interstate Commerce Act generally, would be inapplicable as to Hullquist. *See Centraal Stikstof Verkoop-*

kantoor, N.V. v. Alabama State Docks Dept., 415 F.2d 452, 455–56 (5th Cir.1969); *Pilgrim Distributing Corp. v. Terminal Transport Co., Inc.,* 383 F.Supp. 204, 208 (S.D.Ohio 1974). *See also Interstate Commerce Comm'n v. V.S.C. Wholesale–Warehouse Co.,* 312 F.Supp. 542 (D.Idaho 1969) (distinguishing between company's warehousing business and motor operations).

Hullquist failed, however, to raise this particular argument below, and indeed, raised it here only in the most cursory fashion. Normally, we would consider this legal theory only if our failure to do so would result in a gross miscarriage of justice, and if the ground is so compelling as to virtually ensure success on the claim for the party who failed to raise the issue below. *See Jones v. City of Somerville,* 735 F.2d 5, 7 (1st Cir.1984). This is true even where the question neglected below is whether the statutory source of appellant's alleged liability provides a cause of action against that party. *See Whyte v. Connecticut Mut. Life Ins. Co.,* 818 F.2d 1005, 1011 n. 20 (1st Cir.1987).

In this case, we need not decide whether Hullquist has met this heavy burden, because we are for other reasons remanding the case back to the district court for reconsideration. The district court may, if it sees fit, consider this issue.[7]

### III.

We now return to our mystery, and in particular, to the question of whether the coffee heist *must* have taken place while the container was in Hullquist's possession. The district court reasoned that the coffee could not have disappeared before it reached Hullquist's facility in Everett, i.e., while it was in the custody of Garvey. We agree with this assessment. The Garvey driver completed his trip from Cambridge to Everett in about 40 minutes. There is no dispute that this is the usual driving time for that trip. The Garvey driver could not possibly have emptied the coffee out of the container and still arrived at Hullquist when he did. (It took three

---

7. Of course, if Hullquist is not liable under § 11707(b), it might still be found liable under some other theory, including negligence, depending on the ultimate findings of fact.

men an hour and a half to load the coffee into the container.)

Hullquist also argues that the Garvey driver might have made a quick switch of the containers themselves. Yet it is undisputed that the cargo container that returned from Cambridge to Everett bore the same identification number as that which had been taken from Hullquist earlier that morning. The only plausible scenario that would allow a container "switch," therefore, would be the following: On the way from Everett to Cambridge, the Garvey driver exchanged the empty Hullquist container for another empty, filled the new empty with coffee, and then on the way back to Everett *re* switched the containers so that the original empty was that which arrived back at Hullquist. Hullquist argues that the evidence might have allowed the inference of such a chain of events.

There are at least two reasons, though, why no reasonable jury could have accepted this hypothesis. First, the Hullquist container was unsealed when it arrived in Everett from Cambridge. If the Garvey driver had undertaken a scheme in which he brought back an empty container, he would not have left it unsealed, such that the theft could readily be discovered. Second, Hullquist's scenario assumes that the Garvey driver knew that the P.N.H. representatives in Cambridge would fail to seal the container once it was filled. Had the P.N.H. representative followed standard operating procedures by applying a seal on its cargo in Cambridge, the Garvey driver would have had no choice, on the return "switch," but to exchange the properly sealed container for a container that was either unsealed or sealed with an incorrectly numbered seal. As the district court astutely noted, "delivering an unsealed or improperly sealed cargo container would have been a dead give away of his guilt." There is no basis in the evidence to conjecture that the Garvey driver knew that the P.N.H. representatives would neglect to seal the container; thus it cannot be assumed that he knew in advance that an unsealed container might not be suspicious. Yet the Hullquist hypothesis presumes such knowledge. It is therefore an implausible account, one no reasonable jury could accept.

Hullquist is left, then, with a theory of the crime that could only be explained by magic or an elaborate plot between P.N.H. and Garvey. There is no evidence, direct or inferential, upon which such bizarre scenarios could be submitted to a jury. It was, therefore, proper for the district court to conclude that the heist could not have taken place before the container reached the Hullquist yard.

This alone, however, does not require affirmance of Garvey's motion for summary judgment. The Carmack Amendment differs from the usual detective mystery, in that an airtight alibi does not absolve the initial carrier from liability. Garvey is strictly liable for the damages unless it can demonstrate, by a preponderance of the evidence, that the loss took place over the "route" of a particular carrier. That is because subsection (b) provides for recovery by the strictly liable carrier from "the carrier over whose line or route the loss or injury occurred." In order to be granted summary judgment against Hullquist, then, Garvey must prove not only that the loss did *not* occur while the coffee was in Garvey's possession, but that the loss *did* occur while Hullquist had the container. The burden does not shift to the next carrier in line when the initial carrier proves that it was not responsible for the loss. If the initial carrier, against whom judgment was found in favor of the shipper, cannot demonstrate over which of the intermediate or final carriers' routes the damage occurred, the initial carrier remains strictly liable. In subsection (b), the burden of proof to establish exactly where the loss occurred lies with the carrier found liable under subsection (a). Garvey could not succeed in its motion for summary judgment against Hullquist, then, unless it showed that the loss did not take place over Maersk's route either.

Garvey has failed to meet this burden. The district court granted summary judgment for Garvey because it found that the evidence could not support a reasonable inference that the coffee was stolen after it

left Hullquist's custody. The court based this solution primarily upon the assumption that the Brooks seal and the Maersk seal were intact when the container was opened in Port Newark, and that the original Hullquist seal No. 15388 had been replaced by Hullquist seal No. 18218 before the container was opened. We find, however, that the issue of which seals were intact when the container arrived in New Jersey cannot be resolved for purposes of summary judgment on the basis of the evidence provided.

The evidence on which the district court may have relied for its findings regarding the seals consisted of affidavit and deposition testimony of two Maersk employees and one photograph of questionable probative value. Maersk's Port Newark container yard Terminal Manager testified in his deposition that the Maersk, Brooks, and Hullquist No. 18218 seals were on the container when it was opened. A photograph of the broken seals was marked as an exhibit at the deposition. The Director of Safety and Security at the Port Newark Yard appended to his affidavit a memorandum he had written to the Terminal Manager on April 17, 1985. That memo reflected the same combination of seals. According to both Maersk employees, Hullquist seal No. 15388 was not found on the container.

If this testimony is correct, then the only plausible solution to the case is that the coffee was taken at the Hullquist facility in Everett, and seal 15388 was there replaced by seal 18218. If the coffee had been taken while the container was in the custody of Maersk, the Maersk and Brooks seals would not have been intact when the container was opened.[8] The district court found that because the testimonial evidence as to the condition and identification of the seals at Maersk was "undisputed" and "un-

contradicted," the only logical solution to the mystery was that the coffee disappeared while at Hullquist.

It is true that Hullquist has produced no evidence that would *directly* contradict the assertions of the Maersk employees. Even after discovery, it could find no one at Maersk who would testify that those employees were not telling the truth as to the seals when the container was opened. (Indeed, it seems as if no one else *could* provide contrary testimony, because apparently no one but those two employees observed the events in question.) Normally, this might defeat Hullquist's defense on the motion for summary judgment, if its only argument were that the testimony of those two employees could be discredited at trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (citing *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984)). However, although the testimony of the Maersk employees cannot be contradicted directly, Hullquist has provided circumstantial evidence sufficient to call into question the story proffered by those employees.

Most significantly, the Maersk driver signed a receipt at Hullquist indicating that the Hullquist seal then on the container was indeed No. 15388. Though he now testifies that he did not in fact check to verify the accuracy of the receipt he was signing, the fact that he signed it does support an inference that No. 15388 was on the container when it left Everett. If that were the case, the switch of Hullquist seals took place after the container was already in Maersk's custody.[9] Such a finding would ensure a conclusion that Hullquist was not responsible for the loss. Even if it

---

8. We accept the district court's finding that the seals, especially the Maersk "bullet seal," could not have been compromised (such that the container could be emptied) and then returned back to their former condition after the container was reclosed. At the very least, the evidence does not support such a possibility. In addition, we agree with the district court that the Maersk driver could not have emptied the container somewhere between Everett and Port Newark and still completed the trip in five hours.

9. Hullquist did produce evidence that, because of the frequency with which Maersk used Hullquist as a middleman, there were numerous used Hullquist seals lying around the Maersk yard. One of those seals presumably could have been photographed by Maersk employees if they were attempting to construct a cover-up.

is true that the Maersk driver did not check to see that seal No. 15388 was on the container, the Hullquist employees had no way of knowing that he would be guilty of such an omission. It therefore would have constituted a substantial and unwise risk for one of them to switch seals at that point, when the evidence of such a transfer would be so readily obvious to the Maersk driver if he bothered to make the routine check.

As further evidence that could support a finding that the coffee disappeared while in the custody of Maersk, Hullquist notes that even though the weigh-in when the truck arrived at Port Newark allegedly indicated that the container was empty, no one at Maersk did anything about it until the next morning. Hullquist rightly argues that this is strange behavior for a shipping concern that has just realized that its freight may have disappeared.

Finally, there is something a bit suspicious about the presumption, necessary to Maersk's theory of the disappearance, that the Maersk driver did not detect a discrepancy in the weight of his haul of some 15,000 pounds.[10]

All of this evidence certainly does not *require* a finding that the heist occurred while the container was in Maersk's possession. It may even be likely that the disappearance did take place at the Hullquist facility. But likelihood is not enough for summary judgment. The evidence is not "so one-sided that one party must prevail as a matter of law." *Anderson,* 106 S.Ct. at 2512. Here, "reasonable minds could differ as to the *import* of the evidence...." *Id.* at 2511 (emphasis supplied). There is *"sufficient* evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (emphasis supplied). As the Supreme Court has recently reemphasized:

Credibility determinations, the weighing of the evidence, *and the drawing of legitimate inferences from the facts* are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, *and all justifiable inferences are to be drawn in his favor.*

*Id.* at 2513 (emphasis supplied) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)).[11] Hullquist has supplied sufficient inferential evidence from which a jury could conclude following trial that the explanation of the Maersk employees was not credible.

### IV.

Moreover, even if the coffee did disappear while at Hullquist, the cross-claims against Maersk should not have been dismissed *sua sponte.* The district court did not address adequately Hullquist's claim that Maersk may be liable to it for indemnification in the event that Hullquist is strictly liable for the loss. Maersk concedes that Hullquist was authorized *by Maersk* to accept the container from Garvey, to document the interchange activities, and to hold the container in temporary storage for eventual pickup by the Maersk trucker. Hullquist does, then, seem to have been an agent of Maersk with regard to the container. As such, there is the possibility that Maersk should indemnify Hullquist for certain liability sustained while Hullquist was acting at Maersk's behest. According to the Restatement (Second) of Agency, "[u]nless otherwise agreed, a principal is subject to a duty to exonerate an agent ... to indemnify him for: ... (c) payments of damages to third persons which he is required to make on account of the authorized performance of

---

**10.** The coffee was supposed to weigh about 15,000 pounds. The tractor, chassis and container weighed approximately 26,500 pounds. If the coffee was missing, the combined weight would have been off by about %40. Presumably, such a significant discrepancy would have been noticeable to an experienced driver.

**11.** In *Adickes,* the case cited and reaffirmed by the *Anderson* Court, defendants' affidavit declarations of their states of mind were not sufficient to allow summary judgment where certain circumstantial facts existed that might have tended to impeach the defendants' testimony.

an act which constitutes a tort. . . ."[12] A contractual right to indemnification "may be implied from the nature of the relationship between the parties." *Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth.*, 693 F.2d 1, 3 (1st Cir. 1982).

Because there was no formal motion to dismiss made by Maersk, the record does not reflect the precise nature of the agreement between Hullquist and Maersk, in general or with respect to the P.N.H. container. It is unclear whether Hullquist's "performance" in securing the container as it did on the night of April 9th was explicitly or implicitly "authorized" by Maersk. There is some evidence that the "agreement" was a last minute arrangement, necessitated by the unusual exigencies of the Maersk driver's inability to pick up the container that afternoon. At least one Maersk employee has testified that he was familiar with Hullquist's overnight storage capabilities, or lack thereof, and did not find fault with the procedures used by Hullquist to secure the container. It remains open to question whether Maersk knew, or should have known, when it authorized Hullquist to keep the container overnight, that Hullquist had meager means with which to secure the container. It is also unresolved whether the harm arose "from the performance of unauthorized acts or result[ed] solely from the agent's negligence or other fault," Restatement (Second) of Agency § 440(a), and if so, whether that would foreclose indemnification in part or in full. We express no opinion on how these factual issues should be resolved, nor on the precise standards

that would trigger principal indemnification under Massachusetts law. All of these questions are better left for resolution on remand, where a complete factual record can be established as to the nature of the Maersk/Hullquist agreement, and where legal arguments can be more fully briefed and considered.[13]

This mystery is not yet solved. The clues and alibis do not allow a definite and conclusive solution to the mystery of what happened to the coffee after it arrived at Hullquist. But the inferences adduced from those clues may, when considered by a jury of sleuths, provide a sufficient degree of certainty (i.e., more likely than not) to support a judgment against one party or another. Further issues of ultimate responsibility might then have to be approached through the law of agency and indemnification. If no one solution to this mystery can be established by a preponderance of the evidence, Garvey must suffer the liability for the loss of the coffee, even though it cannot be disputed that the coffee disappeared after it left Garvey's custody.

Summary judgment against Hullquist in favor of Garvey is vacated. Dismissal of Hullquist's crossclaim against the Maersk defendants is also vacated. Because Garvey did not appeal the district court's dismissal of Garvey's crossclaim against the Maersk defendants, we do not address that portion of the judgment.[14] If Garvey wishes to revive its crossclaim against the Maersk defendants, it may petition the district court under Federal Rule of Civil Pro-

---

12. Hullquist's storage of the container overnight, which may have been authorized by Maersk, does not "constitute" a tort. It may, however, have been the cause of the loss, which would in turn create strict liability.

13. Hullquist also argues that it is entitled to seek contribution from Maersk under chapter 231B, § 1 of the General Laws of Massachusetts, on a theory of joint liability. But we have now held that, if Garvey can show that the coffee was stolen while in Hullquist's custody, the Carmack amendment makes Hullquist strictly liable for the loss. In that case, Maersk would not be liable to *Garvey* (or to P.N.H.) at all, and would, therefore, not be a joint tortfeasor. We

express no opinion on whether a party strictly liable may be entitled to contribution from a party whose negligence was a partial cause of the loss for which the first party is strictly liable. *See supra* note 4. That issue may be reached in the district court if the finder of fact determines that Hullquist is strictly liable for the loss and that the loss resulted from negligence on the part of Maersk.

14. Also not before us are those portions of the judgment denying Hullquist's motions for summary judgment and granting P.N.H.'s motion for summary judgment against Garvey.

cedure 60(b)(5) for relief from the judgment of dismissal.[15]

*We vacate those portions of the judgment that were before us on appeal, and remand the case for further proceedings consistent with this opinion.*

---

**15.** We acknowledge that, in rare instances, some appellate courts have themselves granted relief to non-appealing parties in analogous circumstances. *See, e.g., Bryant v. Technical Research Co.,* 654 F.2d 1337, 1341–43 (9th Cir. 1981); *Kicklighter v. Nails by Jannee, Inc.,* 616 F.2d 734, 742–45 (5th Cir.1980); *Tug Raven v. Trexler,* 419 F.2d 536, 547–48 (4th Cir.1969); *In re Barnett,* 124 F.2d 1005 (2d Cir.1942); *see also Hegger v. Green,* 646 F.2d 22, 31–33 (2d Cir. 1981) (Mansfield, J., dissenting in part); *but see*

*id.* at 29–30 (majority opinion). The courts that have utilized this procedure have often taken pains to note the limited scope of its proper use, limiting their holdings to narrow, fact-specific situations. *E.g., Bryant,* 654 F.2d at 1343; *Kicklighter,* 616 F.2d at 744 n. 16. We need not decide whether and when such a practice would be proper. We are confident that the district judge will be adequately solicitous of the equities in applying Rule 60(b)(5).