**STARBOARD HOLDINGS LTD.** and Starboard Cruise Service, Inc., f/u/b/o SIACI, Plaintiffs,

v.

**ABF FREIGHT SYSTEMS, INC.,** and Sentry Security Services, Inc. n/k/a/ Electric Guard Dog, LLC, Defendants.

**Case No. 15–22047–Civ–TORRES**

United States District Court, S.D. Florida.

Signed 02/16/2017

Alfred J. Will, Badiak & Will, LLP, Mineola, NY, William Edward Cassidy, Christian Enrique Rodriguez, Cassidy & Black, P.A., Miami, FL, for Plaintiffs.

Barry N. Gutterman, Barry N. Gutterman & Associates, P.C., Bedford Hills, NY, Heidi M. Roth, Coral Gables, FL, Carlos A. Garcia, Robert Chanderline Bauroth, Wicker Smith O'Hara McCoy Ford, P.A., Ft. Lauderdale, FL, for Defendants.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

EDWIN G. TORRES, United States Magistrate Judge

This matter is before the Court on ABF Freight Systems, Inc.'s ("ABF" or "Defendant") motion for summary judgment ("Motion") against Starboard Holdings LTD and Starboard Cruise Services, Inc. (collectively, "Plaintiffs"). [D.E. 79].[1] Having reviewed the Motion, response, reply, related authorities submitted by the parties, and the record in this case, ABF's Motion is **GRANTED**.

### I. BACKGROUND

This action arises from the theft of Plaintiffs' goods from ABF's warehouse on March 2, 2014 in Miami–Dade County, Florida. [D.E. 41 at 1]. Plaintiffs, incorporated in the state of Delaware, and its wholly owned subsidiary, sell watches and other merchandise, which were stored in ABF's warehouse. [D.E. 27 at 1–2].

Plaintiffs hired ABF to transport Plaintiffs' high valued shipments of watches and jewelry from Dallas, Texas to Miami, Florida.[2] The retail value of the cargo was

---

1. ABF filed its Motion for summary judgment on December 8, 2016.

2. Plaintiffs did not have a written contract with ABF. The shipments in question consist-

$935,069,000. ABF picked up the initial shipment on Dallas on February 24, 2014, arrived at ABF Freight's Miami warehouse, and unloaded the items on February 26, 2014. ABF picked up the second shipment in Dallas on February 26, 2014, arrived at ABF Freight's Miami warehouse, and unloaded it on Friday, February 28, 2014. Upon arrival in Miami, Florida, ABF broke down the consolidated shipment and transferred Plaintiffs' cargo into two storage trailers at ABF's Miami warehouse until ABF secured an appointment to deliver it to Plaintiffs' warehouse.

On or about March 1, 2014 or March 2, 2014, the shipments were stolen from ABF Freight's Miami warehouse by unknown persons. ABF Freight's Miami terminal maintained security measures, including: complete perimeter coverage by Sentry Security Services, Inc. n/k/a Electric Guard Dog, LLC's ("EGD")[3] electric fence system, chains and padlocks, and a 360 degree chain link fence with padlocks.

Shortly after the theft, the Miami–Dade Police Department's Report noted that the point of entry and exit was the ABF Miami terminal's entry gate and the thieves' method of entry was cutting the chain and locks with bolt cutters. ABF's security report further indicated that unknown suspects cut/removed a lock from the driver's gate, forced entry on the dock by damaging a dock door and used forklifts to remove the goods from the two trailers containing Starboard's goods. Plaintiffs claim they unsuccessfully attempted to recover the stolen merchandise and lost more than $75,000, including a $25,000 deductible as a result of the theft. *Id.* at 3.

Plaintiffs initially filed this action in state court against ABF on May 7, 2015.

[D.E. 1–1]. On September 25, 2015, Plaintiffs filed their Motion for Leave to file their First Amended Complaint naming EGD as an additional named Defendant. [D.E. 25]. The Court granted Plaintiffs' Motion on October 5, 2015 [D.E. 26] and Plaintiffs filed their First Amended Complaint on October 8, 2015. [D.E. 27]. The First Amended Complaint alleged "[t]hat Defendant, [EGD], was negligent and further breached its contract obligation to provide security for and properly safeguard Plaintiffs' merchandise being stolen . . . ." [D.E. 27 at 6]. EGD filed its Motion to Dismiss Count V of Plaintiffs' First Amended Complaint [D.E. 41] on November 20, 2015. By an Omnibus Order, the Court granted EGD's Motion to Dismiss Count V of Starboard's First Amended Complaint with leave to refile "in the event that there are additional facts that can be pleaded in good faith to survive dismissal." [D.E. 57 at 6].

Plaintiffs' Second Amended Complaint [D.E. 58] seeks damages from ABF based on four causes of action: bailment, negligence, breach of contract, and conversion. On December 8, 2016, ABF filed its Motion for summary judgment against Plaintiffs. Plaintiffs responded on January 17, 2017 [D.E. 88] and Defendants replied on February 7, 2017. [D.E. 93]. Therefore, this Motion is ripe for adjudication.

## II. APPLICABLE PRINCIPLES AND LAW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

---

ed of 4 separate orders of fossil watches which originated in Texas at the fossil distribution center and were to be transported by Defendant ABF.

3. EGD is a foreign corporation and has its principal place of business in South Carolina. Sentry Security Systems, Inc.'s name has since changed to Electric Guard Dog, LLC.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting another source).

In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A court need not permit a case to go to a jury ... when the inferences that are drawn from the evidence, or upon which the non-movant relies, are 'implausible.' " *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592–94, 106 S.Ct. 1348)).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. In making this determination, the Court must decide which issues are material. A material fact is one that might affect the outcome of the case. *See id.* at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### III. ANALYSIS

#### A. Summary Judgment

The purpose of ABF's Motion is to seek summary judgment—or in the alternative partial summary judgment—against Plaintiffs. As set forth above, this action arises out of two separate interstate shipments transported by ABF from Texas to Florida pursuant to a pricing schedule and bills of lading dated February 24, 2014 and February 26, 2014. ABF's primary argument is that Plaintiffs' only available remedy is the Carmack Amendment because before the goods at issue were stolen while in interstate commerce, ABF contends they were still in transit and thus had not been delivered. Because Plaintiffs only filed suit against ABF asserting *state* law claims (which are allegedly preempted by the Carmack Amendment if the goods were still in transit), ABF contends that Plaintiffs have failed to state a valid claim against ABF and that ABF is entitled to summary judgment as a matter of law. We will discuss the parties' arguments in turn.

### 1. The Carmack Amendment

The basis of ABF's primary argument in support of its Motion for summary judgment is that the Carmack Amendment to the Interstate Commerce Commission Act (the "Carmack Amendment")—49 U.S.C. § 14706, *et seq.*—governs this action. The Eleventh Circuit has made clear that the Carmack Amendment is broad in scope because it "creates a uniform rule for carrier liability when goods are shipped in interstate commerce. To accomplish the goal of uniformity, the Carmack Amendment preempts state law claims arising from failures in the transportation and delivery of goods." *Smith v. United Parcel Serv.*, 296 F.3d 1244, 1246 (11th Cir. 2002) (internal citations omitted); *see also Adams Express Co. v. Croninger*, 226 U.S. 491, 506, 33 S.Ct. 148, 57 L.Ed. 314 (1913) ("Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and *supersede all state regulation* with reference to it.") (emphasis added); *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.*, 89 F.3d 452, 456 (7th Cir. 1996) (explaining that the Carmack Amendment "preempts all state or common law remedies available to a shipper against a carrier for loss or damage to interstate shipments"). Thus, courts have uniformly found that "the Carmack amendment preempts the field and supersedes all state common law rights" because "the federal government entered and pre-empted the field of liability for interstate shipments." *United Van Lines, Inc. v. Shooster*, 860 F.Supp. 826, 829 (S.D. Fla. 1992) (citation and quotation marks omitted); *see also Georgia, F. & A. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 196, 36 S.Ct. 541, 60 L.Ed. 948 (1916) (finding that the Carmack Amendment embraces "all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation, which, as de-fined in the Federal act, includes delivery."). As the U.S. Supreme Court explained:

> [T]he parties to a contract of interstate shipment by rail, made pursuant to the Interstate Commerce Act, could not waive its terms; 'nor could the carrier by its conduct give the shipper the right to ignore these terms which were applicable to that conduct, and hold the carrier to a different responsibility from that fixed by the agreement made under the published tariffs and regulations. A different view would antagonize the plain policy of the act and open the door to the very abuses at which the act was aimed.'

*Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 221, 51 S.Ct. 453, 75 L.Ed. 983 (1931).

Because the Carmack Amendment preempts "virtually any state law claim," *Shooster*, 860 F.Supp. at 828, ABF argues that it is the exclusive remedy available to Plaintiffs. However, ABF contends that Plaintiffs are attempting to avoid the Carmack Amendment with allegations that ABF was a "warehouseman, [and] received Plaintiffs' merchandise upon ABF's verbal agreement to store the Plaintiff's merchandise and owned and/or operated the warehouse where the Plaintiffs' merchandise was stored." [D.E. 58]. ABF takes issue with these allegations because the Carmack Amendment purportedly does not end until the transportation of a shipment is completed and that does not occur until a shipment has both arrived at its destination and the item has been delivered. Accordingly, ABF argues that Plaintiffs are incorrect as a matter of law to conclude that ABF was a warehouseman when the facts conclusively illustrate the opposite

As support, ABF relies on *Intech, Inc. v. Consol. Freightways, Inc.*, 836 F.2d 672,

674 (1st Cir. 1987), where the First Circuit confronted a question of when a written notice of a claim had to be filed and the meaning of "delivery" in interstate commerce. The First Circuit affirmed the district court and found that "[t]he liability of a carrier for damages to goods shipped through interstate commerce extinguishes upon delivery." *Intech, Inc.*, 836 F.2d at 674 (citing *Republic Carloading & Distributing Co. v. Missouri Pac. R. Co.*, 302 F.2d 381, 386 (8th Cir. 1962)). The First Circuit also found that "[d]elivery is question of federal law" and "[s]ince delivery must mean delivery as required by the contract ... (*i.e.* the bill of lading and the tariffs), the intention of the parties defines its scope." *Intech, Inc.*, 836 F.2d at 674 (emphasis in original) (citing *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 212–13, 51 S.Ct. 453, 75 L.Ed. 983 (1931); *Blish Milling Co.*, 241 U.S. at 195, 36 S.Ct. 541).

In determining the meaning of delivery in a contract, the First Circuit found that this may be a question of fact or law. The question is one of law if "reasonable persons cannot differ as to what the contract means, 'either because the language is unambiguous' or the evidence about the parties' intent is 'sufficiently one sided ....'" *Intech, Inc.*, 836 F.2d at 674 (quoting *Boston Five Cents Sav. Bank v. Secretary of Dept. of Housing and Urban Development*, 768 F.2d 5, 8 (1st Cir. 1985). "Otherwise, the question is a factual one." *Intech, Inc.*, 836 F.2d at 674. With respect to a straight bill of lading, the First Circuit explained that delivery is effectuated when there is nothing more to be done by the carrier—irrespective of whether the recipient has accepted the goods or not:

A "straight bill of lading," such as we have here, simply requires delivery of the goods to the consignee. Generally, the spotting of a shipment at the consignee's place of business constitutes delivery regardless of whether the consignee has accepted or rejected the goods. And "[n]ormally unloading is not part of a delivery and is performed by the consignee." However, spotting a shipment is not final delivery if "anything remains to be done by the carrier in order to effectuate a delivery."

*Intech, Inc.*, 836 F.2d at 674–75 (citations omitted).

ABF next relies on the Fifth Circuit's decision in *Keystone Motor Freight Lines v. Brannon–Signaigo Cigar Co.*, 115 F.2d 736, 738 (5th Cir. 1940). In that case, a common carrier appealed from a judgment holding it liable for the value of a shipment of cigars that were stolen (through no fault of its own) before delivery to the consignee. The carrier was delayed in route and did not reach the consignee's place of business on time before it closed on Friday evening. When the place of business opened again on Monday, the cargo was discovered to be stolen. The Fifth Circuit affirmed the district court and held that the carrier was still in possession of the cargo in interstate commerce:

We consider first the claim that a tender of delivery was made which reduced the liability of the Keystone from that of a carrier to that of a warehouseman. This contention is without merit. The mere arrival of goods at their destination does not reduce the liability of the carrier to that of a warehouseman where anything remains to be done by the carrier in order to effectuate a delivery. The owner is entitled to a reasonable opportunity to take or receive his property from the possession of the carrier after the transit is terminated. We are cited and can find no instance where an attempted delivery by a common carrier of goods to a business at a time when the business is properly and regularly closed has been held to be a tender of delivery that

would terminate the interstate character of the shipment and reduce the liability of the carrier.

*Id.* at 738 (footnote omitted). The meaning of "delivery" was a central question in *Keystone* because "a proper tender of delivery would have reduced the liability of the carrier to that of a warehouseman . . . ." *Id.* at 738.

Here, ABF contends that the facts support the conclusion that ABF's carrier liability did not end at the time of the theft—which occurred on March 1 or March 2, 2014—because the two interstate shipments (travelling from Texas to Florida) had not arrived at their destination nor delivered as required. *See, e.g., Ore & Chem. Corp. v. Eagle Star Ins. Co.*, 489 F.2d 455, 457 (2d Cir. 1973) ("The true test is whether the goods, even though temporarily at rest, were still on their way, with the stoppage being merely incidental to the main purpose of delivery.") (citation and quotation marks omitted). Therefore, ABF argues that—similar to the facts presented in *Keystone*—certain actions still needed to be taken by ABF in order to effectuate delivery because both shipments were waiting appointments before delivery to Plaintiffs' warehouse.

In support of its position that it remained a carrier—rather than a warehouseman—ABF contends that it was listed as a motor carrier registered under the Department of Transportation and its agency at the Federal Motor Carrier Safety Administration. ABF also points out that it never agreed to store or permanently warehouse the two shipments at its terminal in Miami, Florida and never charged any store or warehouse related fees for the service. Instead the two shipments were purportedly stopped in transit as part of the delivery process because both shipments required appointments. Once appointments were acquired, ABF contends that delivery would have then been effectuated. Accordingly, ABF argues that finally delivery was not completed at the time of the theft and consequently the Carmack Amendment continued to govern the two shipments at the time of loss because ABF remained a carrier in interstate commerce.[4]

For these reasons, ABF argues that there is no genuine issue of material fact that Plaintiffs have failed to state a valid claim against ABF because the Carmack Amendment preempts all state law claims concerning cargo loss and damage in interstate commerce under 49 U.S.C. § 14706. Specifically, Plaintiffs alleged that ABF "was a warehouseman, [and] received Plaintiffs' merchandise upon ABF's verbal agreement to store the Plaintiff's merchandise and owned and/or operated the warehouse where the Plaintiffs' merchandise was stored." [D.E. 58]. Plaintiffs allege four state law claims against ABF: bailment, negligence, breach of contract, and conversion. But, each of these counts are allegedly insufficient because Plaintiffs (1) failed to identify that the goods were part of an interstate shipment, (2) failed to allege that the Carmack Amendment was a cause of action, (3) refrained from referring to ABF as a motor carrier, and (4) failed to allege that ABF transported the property in interstate commerce. Because Plaintiffs' state law claims are purportedly preempted by federal law and the September 28, 2016 deadline for amending pleadings has long since passed, ABF argues that it is entitled to summary judgment as a matter of law.

Plaintiffs' response to ABF's Motion is that ABF is not entitled to summary judg-

---

4. ABF notes that Plaintiffs' corporative representative, Paul Blackington, allegedly conceded that final delivery was not at ABF Freight's terminal.

ment because there is a genuine issue of material fact as to whether ABF was a warehouseman, and was acting as a warehouseman at the time of the theft. If ABF was acting as a warehouseman, the claims asserted would not be subject to the Carmack Amendment and Plaintiffs' state law claims would not fail as a matter of law. *See PNH Corp. v. Hullquist Corp.*, 843 F.2d 586, 591 (1st Cir. 1988) ("Hullquist seems to have acted in the capacity of a warehouseman, rather than a carrier. As such, Hullquist would only be liable under common law negligence or some other statute. The Carmack Amendment, and the Interstate Commerce Act generally, would be inapplicable as to Hullquist.") (citing *Centraal Stikstof Verkoopkantoor, N.V. v. Alabama State Docks Dept.*, 415 F.2d 452, 455–56 (5th Cir. 1969)); *Pilgrim Distributing Corp. v. Terminal Transport Co., Inc.*, 383 F.Supp. 204, 208 (S.D. Ohio 1974); *see also Interstate Commerce Comm'n v. V.S.C. Wholesale–Warehouse Co.*, 312 F.Supp. 542 (D. Idaho 1969) (distinguishing between company's warehousing business and motor operations).

In support of their argument that ABF acted as a "warehouseman" rather than an interstate carrier, Plaintiffs advance two main points. First, Plaintiffs claim that ABF referred to its Miami facility as a "warehouse" on several occasions and admitted that they provided storage for the shipment at issue when the cargo was stolen. Second, ABF purportedly advertised warehousing services, and charged for those services on prior occasions— leading credence to the claim that ABF was not behaving as a carrier during the robbery.

Plaintiffs also rely heavily on both deposition testimony and discovery responses. One deponent employed by Plaintiffs—Mr. Blackington—testified that the cargo was stolen from ABF's warehouse while being stored for Plaintiffs. Mr. Blackington also testified that it was his understanding that ABF offloaded the goods when it arrived at ABF's facility and that ABF put the cargo in its storage trailers for the weekend. Mr. Crouse's testimony reaches a similar conclusion in that someone broke into the dock area and into ABF's trailers used to store freight for the weekend. Because this area of the warehousing facility was for weekend cargo, Plaintiffs argue that this demonstrates that ABF acted as a warehouseman and not a carrier.

Moreover, Plaintiffs refer the Court to ABF's discovery responses to Plaintiffs' requests to admission where ABF admitted that the cargo was located in a warehouse facility in Miami. [D.E. 88–4 at 2, 14, 19, 21–23]. With respect to the earlier point about ABF advertising and charging for warehousing services, Plaintiffs rely again on the testimony of Mr. Blackington, who confirmed that Defendants have previously charged clients for storing items that were located at the ABF terminal, but not yet delivered. [D.E. 88–2].

 After considering both parties' arguments, the law is clear that the Carmack Amendment provides that "[a] carrier ... [is] liable ... for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported ...." 49 U.S.C. § 14706(a)(1). In order for ABF to be covered under the Carmack Amendment, ABF must have acted as a carrier which is defined as "a motor carrier, a water carrier, and a freight forwarder." 49 U.S.C. § 13102(3); *see also PNH Corp.*, 843 F.2d at 590 (finding that where a defendant acted as a warehouseman rather than as a carrier, the Carmack Amendment was not applicable). Thus, the primary question is whether there is a genuine issue of material fact on whether the

storage of Plaintiffs' cargo in "storage trailers" for the weekend coupled with deposition testimony[5], ABF's purported warehousing services, and ABF's discovery responses is enough to survive summary judgment.

▮▮▮ Courts that have confronted the meaning of "delivery" in tandem with the Carmack Amendment have first examined the contract executed between the parties. As the U.S. Supreme Court explained:

> [T]he bill of lading required to be issued by the initial carrier upon an interstate shipment governs the entire transportation, and thus fixes the obligations of all participating carriers to the extent that the terms of the bill of lading are applicable and valid. The liability of any carrier in the route over which the articles were routed, for loss or damage, is that imposed by the act as measured by the original contract of shipment, so far as it is valid under the act ... It is not to be doubted that if, in the case of an interstate shipment under a through bill of lading, the terminal carrier makes a misdelivery, the initial carrier is liable; and when it inserts in its bill of lading a provision requiring reasonable notice of claims 'in case of failure to make delivery,' the fair meaning of the stipulation is that it includes all cases of such failure, as well those due to misdelivery as those due to the loss of the goods.

*Blish Milling Co.*, 241 U.S. at 194–96, 36 S.Ct. 541 (quotation marks and citations omitted). Therefore, delivery means "delivery as required by the contract, and the terms of the stipulation are comprehensive,—fully adequate in their literal and natural meaning to cover all cases where the delivery has not been made as required." *Id.* at 195, 36 S.Ct. 541; *see also Union Pac. R. Co. v. Beemac Trucking, LLC*, 929 F.Supp.2d 904, 914 (D. Neb. 2013) ("Ultimately, the contract between the parties, as interpreted according to the parties' intentions, controls the issue of when delivery occurs.") (citing *Menlo Logistics, Inc. v. W. Express, Inc.*, 269 Fed. Appx. 715, 718 (9th Cir. 2008)).

To determine whether ABF "delivered" Plaintiffs' goods, the Court will first look to the contract between the parties. However, the parties do not dispute that this transaction lacked a contract, so the Court cannot determine delivery on this basis. [D.E. 88–3 at 120:3–8]. Because there is no written contract between the parties, the Court will turn its attention specifically to the bills of lading and the intent of the parties to determine the meaning of "delivery". *See Intech, Inc.*, 836 F.2d at 674 (finding that what constitutes delivery is governed by the bill of lading or contract and the intent of the parties).

▮▮▮ "[A] bill of lading acts as contract between the shipper and the carrier, and its terms and conditions are binding upon those parties." *PolyGram Grp. Distribution, Inc. v. Transus, Inc.*, 990 F.Supp. 1454, 1459 (N.D. Ga. 1997) (citing *EF Operating Corp. v. American Bldgs.*, 993 F.2d 1046, 1050 (3d Cir. 1993)); *see also Hale Container Line v. Houston Sea Packing Co.*, 137 F.3d 1455, 1469 (11th Cir. 1998) (characterizing the bill of lading as "the contract of carriage"); *Interocean Steamship Corp. v. New Orleans Cold Storage and Warehouse Co., Ltd.*, 865 F.2d 699,

---

**5.** Plaintiffs contend that Mr. Clapner—the manager at ABF's Miami terminal—testified that the merchandise that was unloaded was placed into two permanent non-moveable appointment storage trailers, together with the merchandise of other companies. Thus, Plaintiffs appear to argue that the *nature of the storage containers* is significant in determining whether ABF was a warehouseman. But, Plaintiffs fail to support this argument with any case law and the Court can find no case that supports this position.

703 (5th Cir. 1989).[6] Both bills of lading noticeably indicate that the "SHIP FROM" address was the Emporio Armani/Fossil warehouse located at 10615 Sanden Dr., Dallas, TX 75238 and the "SHIP TO" address was the Duty Paid Warehouse of Starboard, located at 8046 NW 14TH STREET MIAMI, FL 33126. [D.E. 80–1]. Therefore, both bills of lading support ABF's argument that delivery would not be effectuated until the goods at issue arrived at Plaintiffs' address. *See, e.g., Interocean S.S. Corp.*, 865 F.2d at 703 ("A party's obligation to prevent misdelivery of shipped goods derives, in .part, from the terms of the bill of lading. The 'contract of carriage' between a shipper and carrier enunciates the responsibility of the carrier to deliver enumerated goods to a specified location."). Because both bills of lading indicate that final delivery meant the arrival of the goods at Plaintiffs' address, the Court will next turn to the intent of the parties to determine if the record evidence supports that conclusion.

 The basis for the Court examining the intent of the parties stems back to the First Circuit's decision in *Intech, Inc.* (and the many cases that followed it) where the Court emphasized its important role in determining the meaning of "delivery" at the summary judgment stage. *See Intech, Inc.*, 836 F.2d at 674. In that case, the First Circuit affirmed the district court's granting of the carrier's motion for summary judgment and explained that delivery is determined by the underlying contract, which in turn defines the intent of the parties. *See Intech, Inc.*, 836 F.2d at 674. And although the facts in *Intech, Inc.*

included a straight bill of lading—unlike the facts presented—the case remains instructive as to the reasons why the intent of the parties may govern at the summary judgment stage. As the First Circuit explained, "[i]f reasonable persons cannot differ as to what a contract means, 'either because the language is unambiguous' or the evidence about the parties' intent is sufficiently one sided,' the judge must decide the issue as one of law." *Id.* Therefore, the intent of the parties is significant here because—as explained further below—the evidence is so one-sided that there is no genuine issue of material fact.

The First Circuit in *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.* best explained the dichotomy between fact and law at the summary judgment stage:

> [A]n argument between parties about the meaning of a contract is typically an argument about a "material fact," namely, the factual meaning of the contract. But, sometimes this type of argument raises "no genuine issue." The words of a contract may be so clear themselves that reasonable people could not differ over their meaning. Then, the judge must decide the issue himself, just as he decides any factual issue in respect to which reasonable people cannot differ. *See* 3 *Corbin on Contracts* § 554 (1960). Courts, noting that the judge, not the jury, decides such a threshold matter, have sometimes referred to this initial question of language ambiguity as a question of "law," which we see as another way of saying that there is no

6. One initial preliminary issue with the bills of lading from Plaintiffs is that Mr. Crouse testified that a sticker was placed on the bill of lading that stated: "[t]his shipment is not subject to any classification or tariffs which may be established by the carrier. Received subject to the written transportation contract

between shipper and carrier if applicable." [D.E.88–3 at 52:13–53:21]. Plaintiffs take issue with these stickers being placed on the bills of lading, but those arguments are directed specifically to whether Defendant limited its liability. Therefore, the Court need not concern itself with this potential issue.

"genuine" factual issue left for a jury to decide. *See Edmonds v. United States, supra; Rizzo v. Cunningham, supra.* Even if there is ambiguity in the language, however, the evidence presented about the parties' intended meaning may be so one-sided that no reasonable person could decide the contrary. *See 3 Corbin on Contracts, supra.* In such a circumstance, the judge also would take the matter from the jury, deciding the factual question of meaning himself as (in the same sense) one of "law." Thus, our job here is to decide whether the evidence, viewed favorably to the Bank, *see Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir. 1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), so clearly supports HUD and Kenmore that no 'reasonable person' could differ about what the contract means, either because the language is unambiguous or the supporting evidence is sufficiently one-sided.

768 F.2d 5, 8 (1st Cir. 1985). The same reasoning applies here. When one couples the intent of the parties with the two bills of lading, the evidence is so strikingly lopsided that no reasonable person could find that final delivery meant the arrival of the goods to ABF's warehouse. *See Tropeano v. Dorman,* 441 F.3d 69, 82 (1st Cir. 2006) (finding that in limited circumstances, there is no triable issue of fact with respect to intent because "no 'reasonable person' could differ about what the contract means either because the language is unambiguous or the supporting evidence is sufficiently one-sided.") (citing *Boston Five Cents Sav.* Bank, 768 F.2d at 8). Therefore, the Court will now consider the intent of the parties based on the record evidence.

First, Plaintiffs' statement of undisputed facts appears to foreclose their own argument because Plaintiffs plainly admitted that "the high value cargo was to be *stored* until ABF secured an appointment to *deliver* it to Starboard's warehouse." [D.E. 88 at 2] (emphasis added). This statement demonstrates that both parties understood that delivery was not final until ABF secured an appointment and the cargo arrived at Plaintiffs' facility.[7] Second, Plaintiffs' corporate representative, Mr. Blackington, clearly testified that all of the shipments first went to ABF's terminal in Miami before being delivered to Plaintiffs" warehouse. [D.E. 80–3 at 38:20–25]. ("Q. Were all of those shipments, during the time period that you were the transportation manager, did they all go to ABF's terminal in Miami first, before they were ever delivered to you at your company at the warehouse? A. Yes."). Third, Mr. Blackington further testified—as ABF contends in its Motion—that the reason for this arrangement was in order to make appointments and consolidate deliveries. Therefore, the record evidence leaves little doubt that the parties intended final delivery to be effectuated once the cargo arrived at Plaintiffs' warehouse. *See Intech, Inc.,* 836 F.2d at 674 (finding that the "the intention of the parties defines" the meaning of delivery) (citing *Blish Milling Co.,* 241 U.S. at 195, 36 S.Ct. 541).

Next, all of Plaintiffs' arguments in its response to ABF's Motion are without merit.[8] First, Plaintiffs' argument that

---

**7.** ABF notes that Plaintiffs never picked up their goods at ABF's terminal because they knew delivery had not been completed. This general understanding between the parties is further supported by the testimony of Mr. Clapner, who stated that the final journey of Plaintiffs' products was to Starboard's warehouse and that Plaintiffs never picked up their cargo from the ABF terminal. [D.E. 80–12].

**8.** One counterargument that Plaintiffs advance is the Terms and Conditions of ABF's

ABF's discovery responses are evidence of ABF acting a "warehouseman"—rather than a common carrier under the Carmack Amendment—is unpersuasive. The Court reviewed each discovery response and ABF merely admitted that it owned warehousing facilities at certain locations in Miami—not that it was acting as a "warehouseman" on the days in question. Rather than relying on a substantive basis that ABF acted as a "warehouseman", Plaintiffs merely rely on certain words such as "warehouse" to support their argument while omitting any underlying support for the facts presented. Furthermore, ABF objected to Plaintiffs' repeated reference throughout the discovery requests to the use of the word "warehouse".

Second, Plaintiffs' reliance on the testimony of several deponents that characterized the cargo at issue as being put in a "warehouse" or "storage trailers" until ABF secured an appointment for final delivery is problematic because it has no bearing on the *legal* status of whether ABF was acting as a "warehouseman" at the time. The key difference is that the deponents used particular words to characterize ABF's facilities and Plaintiffs overstated that testimony to conclude that it removed ABF from being a common carri-

er under the Carmack Amendment. Moreover, even if one accepts that component of Plaintiffs' argument, Plaintiffs failed to address *any* of the cases [9] that ABF cited, which held that a tender of final delivery is what generally terminates the interstate character of the shipment. *See, e.g., Keystone Motor Freight Lines*, 115 F.2d at 738.

Third, Plaintiffs' reliance on warehousing charges is problematic because it relies on *prior* conduct of transactions with other parties (with no specifics provided) that has no relevance to the facts presented. ABF noted that Plaintiffs were not even charged warehousing fees for the shipments in question (to which Plaintiffs counter argue the charges may have been omitted because the items were stolen), so the Court has no grounds to draw any conclusion for this contention.[10] ABF also argues that Plaintiffs' contentions about warehousing services are unpersuasive because those were all arranged by ABF's sister company, ABF Supply Chain Solutions. Finally, the arguments above fail to rebut the general rule found throughout the plethora of cases cited by ABF, which is that delivery is effectuated only when there is nothing more to be done by the

Uniform Straight Bill of Lading. Specifically, the Bill of Lading states that "[i]f the consignee refuses the shipment tendered for delivery by carrier or if carrier is unable to deliver the shipment, because of fault or mistake of the consignor or consignee, the carrier's liability shall then become that of a warehouseman." The problem with relying on this language is that it was not used in the shipments at issue here. Plaintiffs pointed it out to the Court in order to illustrate "ABF's company policy." [D.E. 88].

9. The Court notes that while Plaintiffs' response brief has ample citations to the record, it lacks the necessary citations to applicable case law. ABF cited numerous decisions that support their position, but Plaintiffs did not distinguish these cases nor present the Court

with any potentially conflicting authority. Therefore, Plaintiffs argued this section of their response brief without any supporting case law and this was detrimental to advancing their arguments.

10. ABF argues in its reply brief that no storage charges were ever assessed for any of the 4700 shipments to Plaintiffs prior to the theft, which is purportedly reflective of the fact that ABF Freight has never acted as a warehouseman for Plaintiffs. ABF admits that it has stored goods for others who pay storage charges and that there are circumstances in which delivery to ABF's terminal has been completed as the final destination. But, ABF argues that this scenario has never been applicable in its transactions with Plaintiffs.

carrier. *See, e.g., Tokio Marine & Fire Ins. Co. v. Amato Motors, Inc.*, 871 F.Supp. 1010, 1014 (N.D. Ill. 1994) ("Generally speaking, delivery occurs when one party surrenders—and the other party accepts—possession, custody, and control of the goods involved.") (citing *Illinois Central R.R. v. Moore*, 228 F.2d 873, 877 (6th Cir.1956)); *see also Eddie Bauer, Inc. v. Focus Transp. Servs.*, 881 F.Supp. 1174, 1179 (N.D. Ill. 1995) ("The intention of the parties defines what constitutes the scope of delivery. Subject to the intent of the parties, delivery occurs when one party surrenders, and the other party accepts, possession, custody, and control of the goods involved.") (citations omitted). This means that even if the Court construed all of the aforementioned facts and inferences in Plaintiffs' favor, ABF would remain a common carrier for the reasons set forth above in *Keystone*.[11]

Notwithstanding the fact that the Carmack Amendment applies here, Plaintiffs' final argument in the first section of their response brief is that "ABF would still be fully responsible because there is unlimited liability because they failed to limit their liability by contract as argued in section 2 of this Response." [D.E. 88 at 16]. This argument is perplexing because it touches upon the next section of ABF's Motion seeking partial summary judgment. However, if the Carmack Amendment applies and it preempts the state law causes of action alleged against ABF, the Court need not determine whether ABF properly limited its liability because Plaintiffs have sued under the wrong statute to be entitled to relief. Instead of alleging four state law causes of action, Plaintiffs

should have filed suit under the Carmack Amendment. Accordingly, ABF's Motion is **GRANTED** because the Carmack Amendment applies and it preempts all of the Plaintiffs' state law claims against Defendant.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that ABF's Motion for summary judgment [D.E. 79] is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th day of February, 2017.

---

11. At one point, Plaintiffs appear to contradict themselves in their response brief. Plaintiffs argue that once the cargo was delivered to ABF's Miami warehouse/terminal, the transportation ended and ABF began acting as a warehouseman and storing Plaintiffs' cargo until *delivery* could occur. Plaintiff's argument is perplexing because it appears to argue that transportation to the initial destination—not delivery to the final location—is what governs. But, Plaintiffs notably cite *no* case in support of this contention.